J-A29005-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| MALOT FAMILY LIMITED PARTNERSHIP, DORIS MELLOTT, AND LOWELL MELLOTT | : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : : : : | |
| MELLOTT FAMILY TRUST BY TRUSTEES, HOWARD MELLOTT, KARLA MELLOTT, RALPH MELLOTT, TRUSTEE, AND DORETTA MELLOTT, TRUSTEE | : : : : : | No. 502 MDA 2020 |

Appeal from the Judgment Entered March 17, 2020
In the Court of Common Pleas of Fulton County Civil Division at No(s):
2012-00445

BEFORE:   DUBOW, J., KUNSELMAN, J., and COLINS, J.[*]

MEMORANDUM BY DUBOW, J.:                    **FILED DECEMBER 31, 2020**

Appellants, the trustees of the Mellott Family Trust (the "Mellotts"),
appeal from the March 17, 2020 entry of Judgment following a non-jury
verdict against them in this Quiet Title action. After careful review, we affirm
on the basis of the trial court's well-analyzed and written November 15, 2019
Opinion.

The facts and procedural history are well known to the parties and we
need not restate them in their entirety here. Relevantly, in 2012, Appellees,
the Malot Family Limited Partnership ("MFLP"), filed a Complaint against the
Mellotts asserting claims of Quiet Title and Unjust Enrichment arising from a

---

[*] Retired Senior Judge assigned to the Superior Court.

boundary dispute between the parties. The Mellotts timely filed an Answer and New Matter and a counterclaim for Timber Trespass.

Over the course of the next six years, the parties litigated this dispute, culminating in a March 2019 bench trial. Following consideration of the testimony and evidence submitted at trial, and the parties' post-trial proposed findings of fact and conclusions of law, the court found in favor of MFLP and directed that the disputed boundary shall be set as depicted in the 2010 survey performed by MFLP's expert Glenn D. Watson. Order, 11/15/20, at ¶ 1. The court also found in favor of MFLP on the Mellotts' counterclaim for Timber Trespass. The court ruled in the Mellotts' favor on MFLP's Unjust Enrichment claim.

The Mellotts filed a timely Post-Trial Motion, which the trial court denied on February 20, 2020. This appeal followed. The Mellotts complied with the trial court's Order to file a Pa.R.A.P. 1925(b) Statement. The trial court filed a Rule 1925(a) Opinion relying on its February 26, 2014, April 17, 2018, and November 15, 2019 Opinions.

The Mellots raise the following two issues on appeal:

1. Whether the trial court erred in determining the location of the western boundary between Mellott[s] and MFLP, where it adopted the boundary based on monuments mentioned in junior surveys but not mentioned in MFLP's deeds, instead of the courses and distances of the senior survey, which the trial court held was the legal boundary, thus violating well-established principles governing the resolution of boundary disputes[?]

2. Whether the trial court erred by (1) precluding Mellott from proving its title based on the law of the case doctrine, (2) using the testimony of a surveyor to establish the location of Mellott[s']

northern boundary line without properly applying judicial principles to determine the extent of the parties' remote predecessor in title, and (3) adopting an unofficial draft as evidence of title, enlarging its extent to more than 170 acres when the predecessor's deed only conveyed titled to 125 acres more or less[?]

Mellotts' Brief at 4 (suggested answers omitted).

The Mellotts' issues challenge findings of the trial court sitting as fact-finder. When reviewing a trial court's decision after a non-jury trial, our standard of review is well-established. "We may reverse the trial court only if its findings of fact are predicated on an error of law or are unsupported by competent evidence in the record. As fact finder, the judge has the authority to weigh the testimony of each party's witnesses and to decide which are most credible." *Parker Oil Co. v. Mico Petro and Heating Oil, LLC*, 979 A.2d 854, 856 (Pa. Super. 2009) (citation and brackets omitted). The trial judge's findings must be given the same weight and effect as a jury verdict and will not be disturbed on appeal unless they are not supported by competent evidence in the record. *Levitt v. Patrick*, 976 A.2d 581, 589 (Pa. Super. 2009). "Furthermore, our standard of review demands that we consider the evidence in the light most favorable to the verdict winner." *Id.* (citation omitted).

In addition, in reviewing a judgment entered in a quiet title action, this Court is limited to determining "whether the findings of fact are supported by competent evidence, whether an error of law has been committed, and whether there has been a manifest abuse of discretion." *Regions Mortg., Inc. v. Muthler*, 889 A.2d 39, 41 (Pa. 2005) (citation omitted). This Court

- 3 -

"will not reverse a determination of the trial court in a quiet title action absent an error of law or capricious disregard of the evidence." *Birdsboro Mun. Auth. v. Reading Co. and Wilmington & N. R.R.*, 758 A.2d 222, 225 (Pa. Super. 2000) (citations and quotation marks omitted).

The crux of the Mellotts' claims is that the trial court erred in relying primarily on the testimony and survey of Glenn D. Watson, MFLP's expert, to determine the locations of the disputed boundaries of the parcels owned by the parties. Our review of the record and the relevant law indicates that the competent evidence supports the trial court's findings of fact, and that the trial court did not err as a matter of law. The Honorable Angela R. Krom, who presided at trial, has authored a comprehensive, thorough, and well-reasoned Opinion, citing extensively to the record, including the Notes of Testimony, and to relevant case law in addressing the Mellotts' challenges. We, therefore, affirm on the basis of that Opinion. *See* Trial Ct. Op., 11/15/19, at 27-28, 33 (finding Watson's testimony pertaining to the location of the "Plessenger Division Line" credible); 28-32 (rejecting, in part on the basis of the law of the case doctrine, the Mellotts' argument that the trial court should rely on acreage to establish the property lines); and 45 (concluding that Watson's "work [was] legally and factually compelling" and that MFLP "demonstrated *prima facie* evidence of title" by the requisite "fair preponderance of the evidence.").

The parties are instructed to attach a copy of the trial court's November 15, 2019 Opinion to all future filings.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/31/2020

Filed 4/7/2020 5:12:01 PM Superior Court Middle District
502 MDA 2020

## IN THE COURT OF COMMON PLEAS OF THE 39TH JUDICIAL DISTRICT
## OF PENNSYLVANIA -- FULTON COUNTY BRANCH

| | | |
|---|---|---|
| Malot Family Limited Partnership,<br>Plaintiff | : | Civil Action - Law |
| | : | |
| v. | : | No. 2012-445 |
| | : | |
| Howard J. Mellott and Karla J. Mellott,<br>Ralph D. Mellott and Doretta K. Mellott,<br>Trustees of the Mellott Family Trust and<br>John J. Mellott and Marjorie A. Mellott,<br>Defendants | :<br>:<br>:<br>:<br>: | Honorable Angela R. Krom, J. |

## OPINION AND ORDER OF COURT



**Before Krom, J.**

## IN THE COURT OF COMMON PLEAS OF THE 39TH JUDICIAL DISTRICT OF PENNSYLVANIA -- FULTON COUNTY BRANCH

| | | |
|---|---|---|
| Malot Family Limited Partnership, | : | Civil Action - Law |
| Plaintiff | : | |
| | : | |
| v. | : | No. 2012-445 |
| | : | |
| Howard J. Mellott and Karla J. Mellott, | : | |
| Ralph D. Mellott and Doretta K. Mellott, | : | |
| Trustees of the Mellott Family Trust and | : | |
| John J. Mellott and Marjorie A. Mellott, | : | |
| Defendants | : | Honorable Angela R. Krom, J. |

## OPINION

Before the Court are the quiet title and unjust enrichment claims of the Malot Family Limited Partnership ("MFLP") and above-captioned Defendants' ("the Mellotts'"), counter claim of timber trespass. After a two-day bench trial and the submission of proposed findings of fact and conclusions of law the Court finds as follows:

## FACTUAL AND PROCEDURAL BACKGROUND

On November 14, 2012, MFLP initiated the instant action by Complaint, asserting claims of quiet title and unjust enrichment stemming from a boundary dispute with the Mellotts. An Amended Complaint followed on January 18, 2013.[1] On March 4, 2013, the Mellotts filed an Answer and New Matter, which included a counterclaim of timber trespass.

MFLP filed a Motion for Partial Summary Judgment on September 30, 2013. On October 2, 2013, the Mellotts also filed a Motion for Partial Summary Judgment.

By Order and Opinion entered February 26, 2014, which is hereby incorporated by reference, this Court granted in part and denied in part the Motions for Partial Summary

---

[1] The Amended Complaint reiterated the substance of the Complaint but modified the identities of the defendants.

1

Judgment. In resolving the cross-motions, we first delineated Areas A and B[2] and Area C[3] as the areas of overlap, *i.e.*, the areas of the disputed boundaries. Noting that *what* the boundary is constitutes a question of law, while *where* the boundary exists is a question of fact, this Court held that the First Harris Deed, from which the Mellotts derive their title, had superior title to the Second Harris Deed, from which MFLP derives their title. We further held that the boundary in Area C is the Plessinger Division Line.[4] Due to latent ambiguities in the First Harris Deed, the Court observed that the Plessinger Division must be reconstructed; however, *where* the line exists on the ground is a factual question the Court could not resolve at the summary judgment stage. With respect to Areas A and B, this Court concluded, based on the agreement of the parties, that the boundary must be determined using the Lake Second Survey.

On May 2, 2017, the Mellotts filed a subsequent Motion for Partial Summary Judgment, seeking a definitive ruling on the boundaries in Areas A and B and Area C. In support, the Mellotts asserted that the net acreage purported to be conveyed by each Harris Deed could be used to determine the boundary in Area C. In Areas A and B, the Mellotts contended that physical monumentation corroborated the survey performed by Thomas Shelly of Shelly and Witter ("Shelly Survey") in June 1998 as depicted on the 2010 survey performed by Glenn Watson ("Watson") of Dennis E. Black Engineering, Inc. ("DEB"); and that the Shelly & Witter Survey line should be adopted as the boundary. MFLP disagreed. By Order and Opinion entered

---

[2] "Area A and Area B of the subject real estate together consist of a 3.9925 acre overlap along the western boundary of lands owned by the Mellott Family Trust (Tract 2) and John J. Mellott and the eastern boundary of MFLP Tracts k and o. Amended Complaint, ¶22, Exhibit 4. Area A and Area B are divided by T-417, known as Mill Road." February 26, 2014 Opinion and Order of Court at 3. (Note: Exhibit 4 of the Amended Complaint is the 2010 survey performed by Glenn Watson and described, supra., as "Watson Survey" and admitted a Plaintiff's Exhibit 1.)

[3] "Area C of the subject real estate consists of a 7.7826 acre overlap between the boundary line established by the Shelly [&Witter] Survey recorded at Fulton County Plat File #166-A and the boundary line established by the [Watson] Survey. Amended Complaint, ¶¶13, 20-22, Exhibit 4." February 26, 2014 Opinion and Order of Court at 3.

[4] The circumstances of the First Harris Deed, the Second Harris Deed, and the Plessinger Division Line are discussed at length, supra.

2

April 17, 2018, we denied the Mellotts' Motion based on our conclusion that the location of the boundaries and the method of ascertaining the boundaries were genuine issues of material fact for trial.

A bench trial was held on the matter on March 21 and 22 of 2019. Following trial, the Court entered an Order directing the parties to file proposed findings of fact and conclusions of law. Both parties have complied, and the matter is now ripe for disposition.[5]

## FINDINGS OF FACT

### I. AREAS OF DISPUTE

#### 1. Area C

Area C is best identified for the purposes of this litigation as encompassing a strip of land in the northeast corner of the survey performed by Watson. Watson's 2010 survey ("Watson Survey") was entered into the record as Plaintiff's Exhibit 1. See Transcript of Proceedings of Bench Trial, March 21, 2019 ("T.P. 3/21/19") at 8, 30; Plaintiff's Exhibit ("Pl. Ex.") 1. The property of Howard J. Mellott (a named defendant in this action)[6] lies to the south/southwest of the disputed boundary; MFLP's property is to the north. See Pl. Ex. 1.

The events as gleaned from the ancient deeds, suggest the following largely undisputed history of conveyance of the property involved in this dispute. In 1865, Mary Divelbiss ("Divelbiss") conveyed a parcel or parcels described as "125 acres, more or less" to Noah Mellott ("Noah") and William Vallance ("Vallance"). Transcript of Proceedings of Bench Trial,

---

[5] As Glenn Watson aptly described and the reader will likely readily discern, "This is one of the most confusing projects in my recent history." Transcript of Proceedings of Bench Trial, March 21, 2019 at 114.

[6] Two individuals by the name of Howard J. Mellott are referenced in the record. The individual hereinafter referred to as Howard J. Mellott the younger is a defendant in this action, while the individual referred to herein as Howard J. Mellott the elder is a predecessor in interest to the Mellotts and is now deceased. T.P. 3/21/19 at 7. In addition, at the risk of appearing inappropriately informal, to avoid unnecessary confusion, we have referred to most individuals in this Opinion by their first rather than their last name. Many of the individuals involved in this matter have the last name "Mellott" or "Malot", spelled differently, but pronounced quite the same.

3

March 22, 2019 ("T.P. 3/22/19") at 70; Defendants' Exhibit ("Def. Ex.") 9. In 1870, Noah and Vallance entered into an agreement to divide the parcel between the two of them. T.P. 3/22/19 at 70; Def. Ex. 8. The written agreement purported to divide 170 acres—rather than the "125 acres, more or less" conveyed by Divelbiss—and conveyed 110 acres, 40 perches, plus allowances to Noah. Id.

Following a series of conveyances, the land held by Noah was obtained by George and Sallie Harris. In March of 1917, George and Sallie Harris executed two deeds, referred to throughout as the First Harris Deed and the Second Harris Deed, respectively. Each deed conveyed a part of an expanse of property subdivided along the Plessinger Division Line, as established by Fulton County Surveyor Frank Plessinger. No record of Plessinger's survey exists today.

The First Harris Deed, dated March 26, 1917, and recorded August 11, 1944, conveyed part of the Harris' land to Howard J. Mellott the elder. The Second Harris Deed, dated March 28, 1917, and recorded July 23, 1932, conveyed the remainder of the property to Grover C. Mellott.

The First and Second Harris Deeds recite differing descriptions of the Plessinger Division Line. The First Harris Deed states the boundary as follows:

> North 79 degrees East 42 perches to a pine knot, South 84 ½ East degrees 36 perches to a pine knot in field, North 4 ½ degrees East 38.4 perches to a pine knot, South 60 ½ degrees East 32.2 perches to a pine knot, South 71 ¾ degrees East 20 perches to a pine knot, South 75 ¼ degrees East 77.7 perches to a pine knot.

See Pl. Ex. 9; Def. Ex. 1. In contrast, the Second Harris Deed recites the Plessinger Division Line as:

> North 79 degrees East 42 perches to a pine knot, South 84 ½ East degrees 36 perches to a pine knot in field, North *54 ½* degrees East 38.4 perches to a pine

4

knot, South 60 ½ degrees East *22.2* perches to a pine knot, North 71 ¾ degrees East 20 perches to a pine knot, South 75 ¼ degrees East 77.7 perches to a pine knot.

See Pl. Ex. 11; Def. Ex. 2.[7] The recitation in the First Harris Deed fails to close by 430.85 perches, *i.e.*, 7,109 feet.[8]

As noted above, for reasons fully discussed in our Order and Opinion entered February 26, 2014, we found the First Harris Deed superior to the Second Harris Deed and concluded that resolution of the boundary dispute in Area C requires reconstruction of the Plessinger Division Line using the calls from the First Harris Deed

## 2.  Areas A and B

Areas A and B lie west of Area C.  Specifically, Area A is the disputed boundary between property owned by the Mellott Family Trust (a named defendant in this matter) and property owned by MFLP.  Area B constitutes the area of dispute along the western boundary of property owned by John J. Mellott (a named defendant), which abuts the property of MFLP. Areas A and B are divided by Mill Road; Area A is northeast of Mill Road and Area B is to the southwest.

---

[7] For the convenience of the reader, below find a side-by-side for comparison with the discrepancies noted in bold, as we noted in our February 26, 2014 Opinion:

| First Harris Deed | Second Harris Deed |
|---|---|
| 1. North 79 degrees East 42 perches to a pine knot; | 1. North 79 degrees East 42 perches to a pine knot; |
| 2. South 84 ½ East degrees 36 perches to pine knot in field; | 2. South 84 ½ East degrees 36 perches to pine knot in field; |
| 3. **North 4 ½ degrees** East 38.4 perches to a pine knot;[7] | 3. **North 54 ½ degrees** East 38.4 perches to a pine knot;[7] |
| 4. South 60 ½ degrees **East 32.2** perches to a pine knot; | 4. South 60 ½ degrees **East 22.2** perches to a pine knot; |
| 5. **South 71 ¾ degrees** East 20 perches to a pine knot; | 5. **North 71 ¾ degrees** East 20 perches to a pine knot; |
| 6. South 75 ¼ degrees East 77.7 perches to a pine knot. | 6. South 75 ¼ degrees East 77.7 perches to a pine knot. |

[8] A perch is equal to 16.5 feet.

5

The disputed boundary in Areas A and B is controlled by the Lake Second Survey, per our February 26, 2014 Order and Opinion. The Lake Second Survey, appears in the record as Plaintiff's Exhibit 3 and Defendant's Exhibit 19.

## II.     THE TIMBER DISPUTE

### 1.     Testimony of Clem Malot

In 2010, MFLP engaged O'Neal Forestry, a contract logger, to cut timber in the vicinity of Area A. T.P. 3/21/19 at 16. Upon reaching the property border, the logging team was approached by Ralph Mellott ("Ralph"), a trustee of the Mellott Family Trust and a named defendant in this action. Id. Ralph pointed out the presence of several rebars in the area and expressed his belief that MFLP had cut timber over the property line denoted by the rebars and into the property of the Mellott Family Trust. Id. at 17. R. Clem Malot ("Clem"), a general partner of MFLP, acknowledged that two points identified as "iron rod found" in Area A on the Watson Survey were the pins that Ralph pointed out to him. Id. at 37. These IRF were highlighted in blue on the Watson Survey and are a part of the disputed boundary. Id.; see Pl. Ex. 1.

O'Neal Forestry later paid the Mellott Family Trust for two times the value of the timber; the payment reduced MFLP's profit from the timbering. Clem believed the payment was conditioned on the findings of a survey. T.P. 3/21/19 at 18, 38-40.

MFLP contracted with DEB to obtain a survey of the boundary. Id. at 18–19. During April through October of 2010, Watson, a surveyor employed by DEB, surveyed the relevant boundaries of MFLP's property. Id. at 21.

6

After the survey was completed in 2012, Clem and Jana Malot, also a general partner of MFLP, met with the Mellotts at DEB's office to discuss Watson's findings. Id. at 22–24. There, the Mellotts brought to Clem's attention another survey, performed by Tom Shelly, which created areas of overlap with Watson's survey. Id. at 23. Based on the meeting, Clem did not believe that the Mellotts took exception to Watson's survey, and MFLP marked the boundary line accordingly. Id. at 25–26. MFLP then recommenced cutting timber, this time in Area C, until receiving correspondence from the Mellotts that indicated the boundary was in dispute. Id. at 26.

Clem also testified that Howard Mellott the younger and Ralph are his cousins. Id. at 27. In addition to being cousins to Clem and neighbors, Ralph and Howard belonged to the Mill Road Hunting Club ("the Club"). Id. at 28. The Club leased property in the area of the dispute. According to Clem, "Probably the easiest way for me to describe it in general terms is all the area in dispute was the borderline between the neighboring property and MFLP for the purpose of the hunting lease." Id. at 29. According to Clem, the Club acknowledged the "dark border that Glenn Watson determined to be the border" in the northwestern and western areas in dispute for the purpose of their lease and "maintained no trespassing signs along there." Id. at 29. Areas A, B, and C were all implicated in the Club lease. Id. at 33. The lease began in 2000 and continued until 2008 when there were some changes to the lease boundaries. Id. at 34. During that eight-year period, Clem believed that the Club agreed to the boundary as located by the Watson Survey. Id.

7

## 2. Testimony of Glenn Watson

As noted above, Watson[9] was retained by MFLP to survey the boundary between MFLP and the respective property owned by the Mellotts. Id. at 53. Watson began his work in the northwest corner of Howard Mellott the younger's property. The northwest corner of Howard Mellott the younger's property is also the northeast corner of Jeffrey E. Gibson's ("Gibson") property. Id. at 57. A survey commissioned by Gibson, referred to herein as the "Angle Survey," called for an iron rod in stones at that point.[10] Id.; see Pl. Ex. 12. Further, the Lake Second Survey, performed in 1904, mentioned a stone pile at that location. T.P. 3/21/19 at 57; see Pl. Ex. 3, Def. Ex. 19. A search in that vicinity led Watson to an iron rod in the stone pile. Id. at 58.

Watson then proceeded east and found a "fairly new" iron pin. Id. at 60. However, Watson determined that the iron pin he found (marked on Watson's survey as IRF)[11] was not the property corner reflected in the documents. Id. at 60–61. Rather, he set an iron rod about 15 feet south of the iron rod found, where he believed the property corner actually existed. Id. He explained that he reached this conclusion based on the reference angle.[12] Id.

After setting the iron rod, Watson turned north toward what is referred to herein as Areas A and B. Watson reached the property of John Mellott ("John"), also a named defendant in this matter. Id. at 61–62. Watson then sought to verify the corners of the property using a survey performed for John by Barry Best[13] ("the Best Survey") in July, 1989. Id.; see Pl. Ex. 5. Watson

---

[9] Watson is a Pennsylvania-licensed as of September 1985. Id. at 50–51. The parties stipulated to Watson's qualification as an expert in the fields of land surveying and title search. Id. at 50.

[10] The survey was recorded on April 30, 2001, following its completion by Robert Angle of the Best Angle Associates Surveying and Engineering Firm. Id. at 57; see Pl. Ex. 12.

[11] IRF is "iron rod found"

[12] Watson explained, "the original surveyors[,] when they were doing their work[,] they were using magnetic compasses and dragging a chain over the slope of the terrain[,] and it just depends on what the back site is; in other words, what is that interior angle based on." Id. at 61.

[13] Barry Best is also of Best Angle Associates Surveying and Engineering Firm. Id. at 62.

8

was unable to find monumentation at the northwestern and southwestern corners of John's property; however, Watson found the remnants of a fence. T.P. 3/21/19 at 61–64. The Best Survey indicates that a fence lies along the western boundary of John's property; *i.e.*, the boundary between John's property and MFLP's property.[14] Id. at 64; see Pl. Ex. 5. John's deed incorporates the Best Survey and shows the fence as the boundary between the property being conveyed by James and Clyde Mellott and property owned by J. Woodrow Mellott, MFLP's predecessor in title. T.P. 3/21/19 at 65–66.

Watson did not believe that the fence along John's property was merely a livestock fence. Id. at 153–54. Instead, Watson opined that the fence had been built to replace an earlier fence that had been intended as a boundary fence. Id. at 155–56. Watson observed that a warrant survey[15] of the location completed on behalf of Robert Cummins ("the Cummins Warrant") had modified an earlier warrant survey of the property of Peter Thompson ("the Thompson Warrant").[16] T.P. 3/21/19 at 154–55; see Def. Ex. 25, 26. Watson further explained,

---

[14] Watson explained that he had spoken with Barry Best who had "indicated that it was not his intention to leave a strip, that he intended—fully intended to put that property line on the boundary"; John Mellott "had a different view." Id. at 137–38.

[15] To assist the reader, some explanation of the warrant process may be helpful. "In [Commonwealth v.] Coxe, [4 U.S. 170, 1 L.Ed. 786, 4 Dall. 170 (Pa. 1800)] the Pennsylvania Supreme Court explained the process of the 1792 Act [which sold the remaining lands of the Commonwealth after the Divesting Act of 1779 transferred title of 47,000,000 acres from the heirs of William Penn to the Commonwealth of Pennsylvania in exchange for £130,000]. First, the land was surveyed, and then, in exchange for paying money to the Commonwealth and the submission of an appropriate survey, a land purchaser was issued a warrant by the land office. The warrant was considered to be a 'sales agreement between the proprietors or the Commonwealth on one hand and the citizen (applicant) on the other. It also served as an order or authorization for the deputy surveyor to perform a survey on behalf of the applicant (warrantee)." Plum Hollow Hunting Club, Inc. v. Fraker, 2014 Pa. Dist. & Cnty. Dec. LEXIS 2794, *37-38, citing Hermansen, Knud Everett, Boundary Retracement Principles and Procedures for Pennsylvania, (1986). The land office acted as the local agent for the Commonwealth. Plum Hollow at *38. After the warrant, the Governor of the Commonwealth issued a patent "which served as prima facie evidence of the title to the patent holder" and conveyed "the full legal title of the state, and is evidence of title against one who relies of possession alone, one who shows no title, and whose rights, if any, accrued after the date of the patent." Plum Hollow at *38-39, citing Olewine v. Messmore, 18 A. 495, 495 (Pa. 1889). "In addition to the land a purchaser obtained via survey and warrant process, all property owners were given an additional six percent (6%) of land free of charge to allow for the construction of roads in what is commonly referred to as the 'incorporeal burden.'" Plum Hollow at *38, citing In re Opening Private Rd. for Benefit of O'Reilly, 5 A.3d 246, 257 (Pa. 2010).

[16] The Cummins Warrant is dated May 9, 1763. Def. Ex. 26. The Thompson Warrant is dated May 20, 1784. Def. Ex. 25.

9

In normal cases and it's been my experience that when an older warrant survey was refined and changed . . ., it was because somebody [who] had moved in as a possessor potentially raised the fence at that point in time...[A]t least there was a misunderstanding of where the lines were until the fence went up[,] which is what we recovered along the John Mellott property.

T.P. 3/21/19 at 155.

Watson also found three iron rods running parallel to the fence; these were the rods that Ralph had pointed out to Clem during the timber operation. T.P. 3/21/19 at 66–67. Watson described the rods as "fairly new looking" and observed that they appeared to match the pin found in the pile of stones. Id. at 66–67. However, Watson found no record deeds or surveys referring to iron pins on the border between John's property and MFLP's property. Id. at 67.

In response to Defendants' assertion that the iron rods found (IRF on the survey) more accurately reflect the distances in the Lake Second Survey, Watson opined that the iron rods fit "[t]oo perfectly." Id. at 146–47. He explained that surveyors in the past "followed the slope of the ground;" however, in the present day, surveyors "are required to report horizontal distances." Id. at 95. As a result, Watson noted, "we find when we measure known points from old warrant surveys, - - we always report shorter horizontal distances than what the original surveyor did because of his measuring the distance along the slope of the ground." Id.

Watson described the area as "… fairly rolling. It's not level. It's not severely steep either, but it's up and down, and I believe that the Mellott Family Trust property was somewhat cleared and what was the MFLP side was wooded." Id. at 67–68.

The length of the southernmost segment of Watson's line in Area A measures 1,542.09 feet. Id. at 136; see Pl. Ex. 1. In perches, the length equals approximately 93.5 perches. T.P. 3/21/19 at 136. The Lake Second Survey, however, notes the distance of the corresponding line as 98.6 perches, ending at a post. Id.; see Pl. Ex. 3. Watson observed that no post was found,

10

but his line ends at the beginning of the fence remnants; he reconciled the discrepancy with the length of line by speculating that the scrivener [of the Lake Second Survey] inadvertently wrote 98.6, instead of 93.6. T.P. 3/21/19 at 140–41.

Seeking to verify the remaining corners of John's property, Watson searched along the eastern edge of the property; one iron rod was found in the southeastern corner, and three iron rods were found in the northeastern corner of the property, along Mill Road. Id. at 62, 68–70. Watson additionally found a railroad spike in Mill Road.[17] Id. at 70–72. After measuring the distance between the iron rods and the railroad spike, Watson determined that the distances were consistent with a survey performed by Richard Fisher in 1989 ("the Fisher Survey") and completed on behalf of James and Clyde Mellott, predecessors in title to the Mellott Family Trust.[18] Id. at 70–71, 74–76; see Pl. Ex. 4.

Once he had determined the boundaries of John's property, Watson attempted to ascertain the boundaries of the Mellott Family Trust property to the north. T.P. 3/21/19 at 72–73. Using the iron rods conforming to the Fisher Survey as the beginning point, Watson used the bearings and distances of the record deeds to determine the remaining corners and set iron rods at each location. Id.

Proceeding east toward what is described as Area C, Watson found a series of capped pins, each denoting that it had been set by Thomas Shelly[19] in the course of completing a survey dated June 8, 1998 ("the Shelly Survey"). Id. at 78–79.[20] Advancing east from the easternmost capped pin, Watson searched for the property corner marker called for in the Shelly Survey;

---

[17] All four of the monuments discovered along Mill Road were found via metal detector. Id. at 72.
[18] The Fisher Survey does not correspond to the Mellott Family Trust tract bordering Area C; rather, Fisher surveyed what is presently the Mellott Family Trust tract immediately to the east of the tract bordering Area C. See Pl. Ex. 4.
[19] Shelly, now deceased, was a surveyor with the engineering firm Shelly & Witter. Id. at 22.
[20] On Watson's survey, the northern line in Area C corresponds to the line created by the capped pins and noted in the Shelly Survey. Watson identified the lines marked by Shelly's capped pins as "B," "C," "D," and "E." See Pl. Ex. 1.

11

however, he was unable to find the marker. Id. at 80–81. Watson instead turned south, along the eastern border of Howard Mellott the younger's property. This area, also a noted area of overlap, is referred to in the record and herein as Area D.[21] Id. at 81; see Pl. Ex. 1.

Watson was unable to find the property corners referred to in the Shelly Survey in the vicinity of Area D.[22] Id. at 81. He did find an iron pipe in the northeast corner of the property owned by Doris Mellott ("Doris"); this monument was referenced in a survey of Doris' property completed by Barry Best. Id. Continuing south along the line called for in the Best survey, Watson found an iron rod, and then another iron pipe at the southeastern corner of Doris' property. Id. at 81–82. The three monuments were consistent with a line called for in Barry Best's survey of Doris' property, but did not fit with the lines called for in the Shelly Survey. Id. at 82. Additionally, the extension of the line formed by the three monuments was in accordance with the observed timber line. Id.

Consistent with the foregoing evidence, and based on additional efforts to survey the adjoining properties of Washabaugh, Taylor, and Lauffer, Watson ultimately concluded that the line marked on the Watson Survey as South 39 degrees, 6 minutes, 15 seconds West, 2,182.03 feet was the proper boundary between Howard Mellott's [the younger] property and MFLP's property.[23] Id. at 82–84. Also relevant to his conclusion was Watson's determination that the boundaries of the MFLP tract matched the boundaries called for in the warrant survey of Samuel Cowan's property, dated November 23, 1883 ("the Cowan Warrant"). Id. at 84; see Pl. Ex. 7. The Cowan Warrant cites the William Parker Warrant Survey, dated April 21, 1797 ("the Parker Warrant"), as its western boundary; this boundary line corresponds to the boundary in Area D.

---

[21] Area D is not in dispute.
[22] The lines denoted by "F," "G," "H," "I," and "J" on the Watson Survey. See Pl. Ex. 1.
[23] The bearing of Watson's line is not in dispute per stipulation by the parties. Id. at 85–88.

12

Id. Watson further opined that his line matched the eastern line in the Parker Warrant. T.P. 3/21/19 at 84; see Pl. Ex. 6.

Referring to his survey in Areas C and D, Watson identified a rotational bearing issue between the Shelly Survey and the field evidence of the Parker/Cowan Survey. Id. at 85. Specifically, Watson identified a six-degree rotational problem. Id. Watson opined that if Shelly's work were rotated South 6 degrees, Area C would be eliminated. Id. at 85, 88.

Returning to the Plessinger Division Line, based, in part, on his reconciliation of the Washabaugh property corners, Watson was not confident that Shelly's capped pins reflected the original location of the Plessinger Division Line.[24],[25] Id. at 90. Rather, in Watson's opinion, the Fisher Survey from 1989 included a line corresponding to the western segment of the Plessinger Division Line as indicated in the First and Second Harris Deeds. Id. Watson concluded that the two iron rods set by Fisher were placed in the locations of the two pine knots noted in the Harris Deeds. Id. at 91; see Pl. Ex. 4.

After establishing what he believed to be the beginning of the Plessinger Division Line, and recognizing that the Plessinger Division Line was only a portion of the Parker/Cowan Warrant line, Watson began seeking the terminus or end point of the Parker Survey. T.P. 3/21/19 at 93. The Parker Warrant calls for a pine tree, while the Cowan Warrant called for a fallen pine tree. Id.; see Pl. Ex. 6, 7. After an extensive search, Watson was unable to find evidence of a pine tree that would have existed in 1787 and 1883, the dates of the Parker and Cowan Warrants, respectively. T.P. 3/21/19 at 94–96.

---

[24] Watson believes the job of a surveyor is to walk in the steps of the original surveyor. T.P. 3/21/19 at 92–93.
[25] The Mellotts agree that the Shelly Survey is wrong; however, to the Mellotts, both the Watson's Survey and the Shelly Survey's lines in Area C are in dispute. T.P. 3/21/19 at 87–88.

13

Lacking monumentation in the northeast corner, to set the corner Watson used the lengths reflected in the record deeds[26] to measure the line beginning with the property corners found around the Doris Mellott property and the Brett Ford property. Id. at 96. He compared those property corners with the Lake Second Survey. Id. Watson noted, "The Lake Second Survey was the survey that was done prior to some of the Howard Mellott [the younger] predecessors selling out parcels." Id. at 97. Watson explained that both Brett Ford's and Doris' parcels came out of the Lake Second Survey. Id. "[…] but the common point between the Lake Second Survey in this area is the southeast corner of the Brett Ford property…" (which is identified with a green arrow on Plaintiff's Exhibit 1). Id.; see Pl. Ex. 1.

Watson explained his methodology: Howard Mellott the younger owns the property south of Area C and bordering the MFLP tract. See Pl. Ex. 1. Howard's current deed calls for a boundary line marked as South 32¼ degrees West 101.5 perches in Tract 1; the First Harris Deed contains an almost identical call.[27] T.P. 3/21/19 at 100; see Pl. Ex. 39. The Lake Second Survey calls for a line [highlighted in green on Defendant's Exhibit 19] of South 37 degrees West 105.4 perches to a pin oak. T.P. 3/21/19 at 100,117; see Pl. Ex. 3, Def. Ex. 19. The two lengths together equal 206.9 perches.[28] T.P. 3/21/19 at 96–102. Starting in the southeastern corner of the Brett Ford property, Watson set the northeast corner in Area C, more specifically what he believed to be the terminus of the Plessinger Division Line, by calculating "[t]he sum of the length of the Brett Ford property, the next line of 417. 25 [feet], the next line of 497.33 [feet] and the next line of 2,182.03 [feet]." Id. at 101-102. As a result, Watson had "a beginning point and

---

[26] Howard Mellott the younger's current deed for Tract 2, Deed Book 503, and page 274. T.P. 3/21/19 at 98; Pl. Ex. 39.

[27] The First Harris Deed calls for a bearing of South 32 ½ degrees, rather than South 32¼ degrees. See Pl. Ex. 9.

[28] 3413.85 feet (206.9 perches x 16.5 feet per perch =3413.85 feet)

14

an ending point to follow from . . . in order to follow Frank Plessinger's footsteps in 1917." T.P. 3/21/19 at 102, 116.

Problematically, the Plessinger Division Line is determined by the calls in the First Harris Deed which contains latent ambiguities and fails to close by over a mile. Id. at 103. To reconcile the problems in the First Harris Deed, Watson felt that it made sense to look to the Second Harris Deed to "see what was intended."[29] Id. at 103–04. Watson explained:

> ... the Second Harris Deed[,] while it is not complete in its description there is a distance missing and a bearing missing in that description but it closes closer than what the First Harris Deed does and I think, Your Honor, you had prepared a side by side comparison between the two descriptions in your opinion on the defendants' second motion for summary judgment, and it's easy to see when you do that side by side comparison that the First Harris Tract...[30]

> [...]

> When we take a look at where the beginning point was on that side by side comparison the first line matches. The second line matches and then there's a discrepancy between the third and the fourth lines of significant difference. What it seems to me and what I've seen before is that when a scrivener misses or miswrites a particular course, it's usually in the form of dropping something, dropping a letter, dropping a number, and what appears to have happened is that the third course, the five was dropped in writing the First Harris Deed, so instead of being North 54 and a half degrees East, the scrivener wrote it as North 4 and a half degrees East, a significant difference of 50 degrees.

---

[29] Watson completed his survey prior to this Court's ruling that the First Harris Deed is superior to the Second Harris Deed. At the time he completed his survey, he believed that the Second Harris Deed had superior title. T.P. 3/21/19 at 110.

[30] Again, for the convenience of the reader below find the side-by-side comparison of the two deeds with the discrepancies noted in bold, as we noted in our February 26, 2014 Opinion:

| First Harris Deed | Second Harris Deed |
| --- | --- |
| 1. North 79 degrees East 42 perches to a pine knot; | 1. North 79 degrees East 42 perches to a pine knot; |
| 2. South 84 ½ East degrees 36 perches to pine knot in field; | 2. South 84 ½ East degrees 36 perches to pine knot in field; |
| 3. **North 4 ½ degrees** East 38.4 perches to a pine knot;[30] | 3. **North 54 ½ degrees** East 38.4 perches to a pine knot;[30] |
| 4. South 60 ½ degrees **East 32.2** perches to a pine knot; | 4. South 60 ½ degrees **East 22.2** perches to a pine knot; |
| 5. **South 71 ¾ degrees** East 20 perches to a pine knot; | 5. **North 71 ¾ degrees** East 20 perches to a pine knot; |
| 6. South 75 ¼ degrees East 77.7 perches to a pine knot. | 6. South 75 ¼ degrees East 77.7 perches to a pine knot. |

The second indication of a significant difference is the very next line where the two distances don't match by 10 perches. Again, I think it was a matter of the scrivener not duplicating what he was given to copy, but at any rate once you recognize those two potential errors it becomes a necessity to rely on the math from the Second Harris Deed because it forms a better figure.

In my opinion it makes you follow in the footsteps of what Plessinger did in 1917 and when you make that six degree correction you wind up where he did; in other words, when you apply that six degree correction to lines B, C, D, and E it follows closely to what the Harris Survey, the second deed description, and you wind up at the ending point giving Howard his full length – Howard Mellott [the younger] his full length of a deed length along his property, so in my mind we've checked off a couple of boxes. We followed in the footsteps of the original surveyor. The math of Second Harris Deed is more closely what the intention was of what Plessinger did from a bearings distance perspective, and we fit within other record documents and physical evidence that we find on the ground reconciling some of these error that are with – latent ambiguities within the deed descriptions.

T.P. 3/21/19 at 104-106 (footnote added).

In Watson's professional opinion, to a reasonable degree of professional certainty, his survey correctly interprets the boundary between MFLP and the Mellotts. Id. at 106. In addition, Watson testified that he had spent in excess of 100 hours researching, formulating his boundary survey, and reconciling in his own mind his opinion that his survey was the correct boundary between the properties. Id. at 107. Approximately a third to a half of the over 100 hours was spent title searching. Id. at 121. Watson acknowledged that at the time he completed his survey, he did not know about Noah Mellott. Id. at 122.

Watson did not rely on acreage when he completed his survey; rather, he was "more interested in knowing where the division line was run on the ground." Id. at 111. The field evidence located by Watson was the two pine knots as indicated on the Fisher Survey. Id.

16

## 3. Testimony of Allen Henry

Allen Henry ("Henry") undertook a title search on behalf of the Mellotts for purposes of this litigation.[31] He also used software to the plot deed descriptions. Id. at 192.

### A. Areas A and B

Henry's research began in the vicinity of Areas A and B. Henry explained that the Mellott's title in Areas A and B is derived from the Parker Warrant, surveyed on April 21, 1796, which cites to "Cummins Land" to the west and to "Ph.p Miller" to the north. T.P. 3/22/19 at 5–9; see Def. Ex. 24 and 26.

From the Parker Warrant, Henry obtained the Cummins Warrant, surveyed September 5, 1787, which led him to the Thompson Warrant, surveyed May 20, 1784. T.P. 3/22/19 at 8–12; see Def. Ex. 25, 26. The Thompson Warrant is a survey of the same location as the Cummins Warrant, performed at an earlier date; however, the two warrants do not match. Id. at 13. Compare Def. Ex. 25, 26.[32] Using the Cummins Warrant, Henry opined that the boundary at issue [in Areas A and B] is the dashed or "picket" line highlighted in blue on Defendant's Exhibit 26. T.P. 3/22/19 at 16; see Def. Ex. 26.

The parties dispute whether a line in the Cummins Warrant says "South **43** degrees West" or "South **13** degrees West." Watson interpreted the number as "43"; while Henry interpreted the number as "13". T.P. 3/21/19 at 150-153; T.P. 3/22/19 at 17-18. To prove his interpretation

---

[31] MFLP objected to Henry's qualification by the Court as an expert witness. See T.P. 3/21/19 at 184-204. We overruled the objection and permitted Henry to testify, understanding Henry's qualifications. Rather than preclude the testimony, we noted that Henry's qualifications go to the weight, rather than the admissibility of his testimony. Id. at 203-204. Henry holds a bachelor's degree in mathematics and a master's degree in computer science. Id. at 185. He taught computer science for approximately 40 years before retiring in 2010. Id. at 185–86. His experience in title search stems from his involvement in securing vacant land for his hunting club; in the process of completing the relevant application, Henry reviewed hundreds of deeds. Id. at 186–88. He was subsequently involved in court cases, including boundary disputes pertaining to the hunting club as well as oil and gas cases in Williamsport, Pennsylvania. Id. at 188–90. Henry is not a surveyor and did not complete any survey for the purposes of this litigation.

[32] The trial testimony references highlighted areas on the exhibits that are simply not there. We feel this error occurred as Counsel for the Mellotts and Henry attempted to simultaneously mark exhibits during testimony. See T.P. 3/22/19 at 15-17; see Def. Ex. 25, 26.

was correct, Henry used software to plot the Cummins Warrant in several ways; specifically, Henry assumed the number to be a "43", a "13", and a "31". Id. at 18-24; see Def. Ex. 43.[33] Henry found that when he plotted a South 43 degrees West line, it did not create a closed figure. Id. 21. Plotting a South 13 degrees West line did not result in a closed figure. Id. at 22. However, plotting a line of South 31 degrees West created a closed geometric shape; accordingly, Henry concluded that the scrivener had erroneously reversed the 3 and the 1. Id. at 22-24. Henry further concluded that his plot of the Cummins Warrant using a South 31 degrees West line appeared to match the shape depicted in the Cummins Warrant. Id. at 25.

Henry next turned to the Lake Second Survey. See Def. Ex. 19. Referring to the exhibit, Henry identified the line highlighted in pink [on Defendant's Exhibit 19] as the western boundary between MFLP and Defendants [in Areas A and B]. T.P. 3/22/19 at 27. Again, the parties dispute the interpretation of numerals in the length of a line in the Lake Second Survey. Id. Specifically, the dispute is over whether a line is "93.6" perches, as interpreted by Watson, or "98.6" perches as interpreted by Henry. Id. at 28. Henry used the Cummins Warrant, as well as deeds he identified as being in MFLP's chain of title, "the Skiles Deed" and "the Price Deed," to confirm his interpretation. Id. at 28-32; See Def. Ex. 30, 31.

Henry requested Timothy Witter, a professional surveyor who also testified at trial, prepare a summary drawing of the Thompson and Cummins Warrant Surveys, incorporating the Price and Skiles Deeds and the Lake Second Survey. T.P. 3/22/19 at 37; Def. Ex. 27. With this drawing, Henry attempted to demonstrate that the 83.2 perch line from the Skiles Deed, when added to the 15.4 perch line from the Price Deed, yields the 98.6 perch line called for in the Lake

---

[33] Over MFLP's objection, Defendant's Exhibit 43 was admitted for demonstrative purposes only.

18

Second Survey. T.P. 3/22/19 at 44-45; Def. Ex. 27.[34] The line highlighted in blue on Defendant's Exhibit 27 represents two courses from both the Lake Second Survey and the Price Deed. Id. at 46; Def. Ex. 27. Henry opined that the final call of the Lake Second Survey, as plotted on Defendant's Exhibit 27, is S 88 E 31.7 perches.

## B. Area C

In Area C, Henry was asked to look at the chain of title for Defendants. T.P. 3/22/19 at 53. He traced title back to Noah, "and there I found that [sic] was purportedly the description in the – that was the description that was used in the first – at least it was an attempt to define the division between the First and Second Harris Deed…" Id. at 55. Noah conveyed to Warner Thomas ("Thomas") on or around November 14, 1870; Henry noted that the conveyance was part of a larger tract of land conveyed by Divelbiss to Valance and Noah by deed dated November 11, 1865. Id. at 60; Def. Ex. 7. Noah had a judgment against Thomas that was satisfied on April 19, 1877. Id. at 61; Def. Ex. 5.

Henry located the deed from Divelbiss to Noah and Vallance. T.P. 3/22/19 at 63; Def. Ex. 9. Henry did not locate any deed conveying the property at issue to Divelbiss. Id. at 64. The record suggests that Divelbiss obtained a 25-acre tract from the High Sheriff of Fulton County as well as a second tract containing 100 acres. Id. at 65. Henry noted that the deed from Divelbiss to Noah and Vallance includes no metes and bounds description, only a total quantity of land and adjoiners. Id. at 66; see Def. Ex. 9.

The agreement between Noah and Vallance recited an undivided parcel of land in Licking Creek Township containing 125 acres, more or less. T.P. 3/22/19 at 67-68, 70; Def. Ex. 8. Henry uncovered no evidence that Noah acquired title to property other than that which he

[34] Defendant's Exhibit 27 was admitted over the objection of MFLP for demonstrative purposes only. The drawing is not substantive evidence of the length of the line in question.

received from Divelbiss. Id. at 70. He also found no evidence that Noah and Vallance acquired anything more than 125 acres. Id. Philip Miller, George Metzler, Andrew Sipes were noted as adjoining property owners. Id. at 68. The agreement does include a drawing which depicts Noah with 110 acres, 40 perches and Vallance with 49 acres, 189 perches. Id. at 70, see Def. Ex. 8.

Based on his analysis, Henry concluded that a "dead pine fallen or something like that" called for in the agreement between Noah and Vallance is the Parker/Cowan/Miller Corner. Id. at 73.

Based on the evidence Henry found, "At the time they created their agreement [Noah and Vallance] had 125 acres more or less." T.P. 3/22/19 at 78. However, the agreement indicates that Noah and Vallance surveyed or drafted approximately 170 acres. Id. at 79. Henry traced the title from Noah to George Harris. Id. at 81. He did not find any evidence George and Sally Harris, grantors of the First and Second Harris Deeds, had acquired any additional property – other than what Noah had. Id. at 81.

The First Harris Deed conveyed 82 acres, 71 perches "net measure." T.P. 3/22/19 at 83; Def. Ex. 1. The Second Harris Deed conveyed 42 acres, 37 perches "net measure." Id. at 83; Def. Ex. 2. According to Henry, the total acreage conveyed by both deeds was approximately 125 acres. Id. at 84-85. In Henry's opinion, George Harris did not have 125 acres to convey.[35] Id.

According to Henry, Howard Mellott, the elder, owned everything in the William Parker warrant [through the First Harris Deed and other conveyances] except for the parcel transferred to G.C. Mellott by the Second Harris Deed. T.P. 3/22/19 at 87.

---

[35] There is no evidence that the Vallance title was ever acquired by George Harris. T.P. 3/22/19 at 86.

20

## 4. Testimony of Timothy Witter

Defendants presented the testimony of professional land surveyor Timothy G. Witter ("Witter").[36] Witter was engaged to perform a survey of the western boundary which Watson had already surveyed [described herein as Areas A and B]. T.P. 3/22/19 at 133. Witter described his process, which included physically locating iron rods, "coordinated in our computer system and inversed distances and evaluated and reviewed our findings and compared that to the Second Lake Survey and ultimately prepared a drawing showing our findings and how things compared." Id. at 134. Witter's Survey is dated October 27, 2017, and consists of three drawings. See Def. Ex. 39.

Witter located the first existing iron rod in stones (IRF in stones #1).[37] Id. at 137; Def. Ex. 39. He did not locate the pine stump next called for in the Lake Second Survey, but did find two rebar in that location (IRF #2, "Rebar (found)"). Id. He located the third iron rod (IRF #3). Id. at 138. He located rebars in the area of [Mill Road] (IRF #4 and IRS #4B). T.P. 3/22/19 at 139-140. He located the fifth and sixth iron rods. (IRF #5 and IRF #6). Id. at 140.

Witter recorded his work on a set of drawings. See Def. Ex. 39. He explained, "Our courses and distances that we show on [Defendants' Exhibit 39] in black are based on our actual field measurements in the Pennsylvania State Grid Datum. [...] The red are the actual courses and distances in perches as shown on the Lake [Second] Survey." Id. at 141. Witter explained that there is no red line "because that red line would then be under the black line if you would."

---

[36] Witter is employed by Fox and Associates and manages the Greencastle Office as Shelly, Witter and Fox. T.P. 3/22/19 at 131-132. He has been employed as a surveyor since graduating from Penn State Mont Alto in 1978. MFLP stipulated to Witter's qualifications as a professional land surveyor. Id.

[37] Witter acknowledged that he searched the property corners of Jeffrey Gibson from the Angle Survey and found that the corners of Gibson matched the iron rod found in stones, which helped to reconcile that the iron rod found in stones was the correct corner. T.P. 3/22/19 at 156.

21

_Id._ There are some small variances where the red line deviates from the iron rods found, but according to Witter, it is not enough to show up at this scale. _Id._ at 142.

Witter included tables which show "comparisons and differences between the bearings or surveys, Lake [Second] Survey bearings." T.P. 3/22/19 at 143; Def. Ex. 39, Table 1. The first column on Defendant's Exhibit 39, Table 1, represents the bearings from the actual field locations of the iron rods found. _Id._ Witter found no original monumentation. Therefore, he explained, "... if there's absolutely no monuments existing that you could find then you would use the courses and distances of the deed you're working with." _Id._ at 144. The second column in red represents the Lake [Second] Survey bearings. _Id._ The third column in green represents, "They are adjusted to the physical location of the pins we located by taking the Lake [Second] Survey bearing of South 88 Southeast and laying that on the first course and then computing the existing location of the iron rods throughout." _Id._ The fourth column shows "the difference between the Lake [Second] Survey courses or bearings and the bearings that we adjusted to." _Id._ at 145. In Witter's opinion, the bearing differences "show how closely they resemble the Lake [Second] Survey." _Id._

On cross-examination Witter conceded that his drawing has an 84.63' line of forced closure that Watson's does not have and that does not appear on the Lake Second Survey.[38] T.P. 3/22/19 at 151. He also acknowledged that a survey prepared by Barry Best for James and Clyde Mellott, predecessors in interest to Defendant Mellott Family Trust, "held the line along an existing identified monument on the ground in the form of an old fence" and that Watson used

---

[38]On Watson's Survey, the referenced line of forced closure is the 6th course, with a bearing of S 06°31'07" W that does not appear on the Lake Second Survey. T.P. 3/21/19 at 159-160.

the same longstanding monument. Id. at 152.[39] Witter also agreed that the only person who surveyed the boundary the entire way around the property of MFLP and Defendants "and reconciled the pin in the stones all the way over the Marjorie Mellott's property" was Watson. Id. at 154. Witter's assignment was limited to determining if the iron rods found "were in a similar shape to the western boundary of the Lake Second Survey." Id. at 155.

### 5. Testimony of Ralph Mellott

Defendants presented the testimony of Ralph Mellott (referred to as "Ralph," throughout), a named defendant, who, along with his wife Doretta K. Mellott, is a trustee of the Mellott Family Trust. T.P. 3/22/19 at 114. Ralph is the grandson of Howard J. Mellott the elder. Id. Ralph recalled monuments on the property "[…] there as long as I can remember." Id. at 116. [40,41] Specifically, Ralph identified a monument "with a stone around it," and an iron pipe in the ground "in the hollow back of John Mellott's house." Id. (It appears that these monuments were marked with green "X's" on Defendant's Exhibit 19.)

Ralph reported that the other iron rods found were placed by Jeremy Fletcher ("Fletcher"), a surveyor who "run [sic] it there along before the other outfit come [sic] in." Id. at 117-118. Fletcher belonged to the Mill Road Hunting Club. Id. at 118. Ralph helped Fletcher when he set the iron rods. Id. at 118. Referring to Plaintiff's Exhibit 1 (misidentified in the record by counsel as Defendant's Exhibit 1), Ralph identified the iron rods found in Area A and

---

[39] In response to Mr. Benchoff's inquiry, "So that fence has existed since from Ralph's testimony approximately 70 years and it was recognized on Barry Best's Survey which is dated August 28, 1989?" Witter responded, "Yes." Id. at 153.

[40] It was frustrating for this Court to attempt to review the transcript and evaluate the testimony without adequate reference by counsel to the exhibits used with this witness (and others). We presume that counsel is referring to Def. Ex. 19, the Lake Second Survey based on the cross-examination questions. See T.P. 3/22/19 at 116; 124-125.

[41] Ralph was born in 1943. Id. at 117.

highlighted in blue as the "pins" Fletcher set. Id. at 118. When the timber was cut to the south of the markers, he knew the timber contractor was on his property. Id.

Ralph was also aware of the boundary markers set by the 1989 Fisher Survey, as Fisher prepared the survey for Ralph. T.P. 3/22/19 at 119. Ralph was aware of an iron stake at [Mill] [R]oad, as well as several others. Id. Ralph was aware that the Fisher Survey fits within the boundary survey prepared by Watson. Id. at 123; see Pl. Ex. 4. Further, Ralph acknowledged that John's property and MFLP adjoin "on the same line." Id. at 124.

With respect to the meeting with Watson, Ralph testified that he told them he knew where the pins were but he was ignored. Id. at 122. Ralph helped build the fence at issue with his grandfather and his uncle. Id. They fenced in a field for cattle; they did not fence in the woods. Id. Ralph recalls there was a strip of woods between "the field and the line." Id. at 126.

### 6. Testimony of John Mellott

John Mellott (referred to as "John" throughout) testified that Barry Best used the fence line as the boundary line. T.P. 3/22/19 at 129. John did not know if the fence was the boundary line. Id. at 130.

### 7. Glenn Watson, in rebuttal

Watson was called to rebut the testimony of Ralph with respect to the pins set by Fletcher. According to Watson, Fletcher was an employee of DEB under Watson's supervision working as the crew chief for this project. T.P. 3/22/19 at 176. Fletcher worked with Watson to set the pins on the line that Watson determined, "upon reconciliation of all of the majority of the field physical and record evidence," was the border between MFLP and the Mellotts. Id. When

24

Fletcher worked for Watson, Fletcher was unlicensed and Watson would have confirmed any field work Fletcher did. Id. at 176-177.

## CONCLUSIONS OF LAW

"The plaintiff bringing a quiet title action has the burden of proof and must recover on the strength of its own title." Woodhouse Hunting Club, Inc. v. Hoyt, 183 A.3d 453, 457 (Pa.Super. 2018). The plaintiff must be in possession of the land in controversy; if he is out of possession, his sole remedy is an action in ejectment. Plauchak v. Boling, 653 A.2d 671, 674 (Pa.Super. 1995). The plaintiff must demonstrate good title "by a fair preponderance of the evidence."[42] Poffenberger v. Goldstein, 776 A.2d 1037, 1041 (Pa.Cmwlth. 2001). Plaintiff must show *prima facie* evidence of title and, upon such a showing, is deemed to have title, unless better title is shown by an adverse party. Id. (citing Pa. Game Comm'n v. Ulrich, 565 A.2d 859, 861 (Pa.Cmwlth. 1989)).

In resolving a boundary dispute, the trial court's function "is to ascertain the intent of the grantor at the time of the original subdivision." Pencil v. Buchart, 551, A.2d 302, 305–06 (Pa.Super.1988). "The question of what is a boundary is a matter of law, but the question of where a boundary line, or a corner, is actually located is a question of fact." Baker v. Roslyn Swim Club, 213 A.2d 145, 148 (Pa.Super. 1965), quoting Guerra v. Galatic, 137 A.2d 866 (Pa.Super. 1958). "Boundaries may be established by circumstantial as well as direct evidence."

---

[42] "A preponderance of the evidence is the greater weight of the evidence, *i.e.*, to tip a scale slightly is the criteria or requirement for preponderance of the evidence. The preponderance test is the normal burden of proof in most civil proceedings. Indeed, the term "burden of proof," standing alone, implicitly means "by the preponderance of the evidence." In re Navarra, 185 A.3d 342, 354 (Pa. Super. 2018) (internal quotation marks and citations omitted).

25

<u>Roslyn Swim Club</u>, 213 A.2d at 148, quoting <u>Hostetter v. Commonwealth</u>, 80 A.2d 719 (Pa. 1951).

"As a general rule, where there is a conflict between course and distances or quantity of land and natural or artificial monuments, the monuments prevail. Moreover, natural monuments take preference over artificial marks or monuments."[43] <u>Pencil</u> at 306 (citation omitted). <u>See also</u>, <u>Roslyn Swim Club</u>, 213 A.2d at 148, ("Courses and distances in a deed must give way to monuments on the ground.")

However, these rules "are no imperative but are aides in construction that must yield to a contrary showing." <u>Id</u>. Further, the "rule cannot prevail where the monument claimed is so manifestly wrong as to lead to an absurd result... An alleged monument, which is a palpable mistake, will be disregarded." <u>Id</u>. quoting <u>Post et at v. Wilkes –Barre Connecting R.R. Co.</u>, 133 A. 377, 378 (Pa. 1926).[44] In such a case, "a resort will be had to the courses, distances and quantity." <u>Id</u>.

> Accordingly, courses and distances will prevail over monuments where absurd consequences might ensue by giving controlling influence to a call for the latter, or where, in any given case, a consideration of all the facts and circumstances shows a call for distance to be the more reliable or certain, or where the call for the monument was inserted by mistake or inadvertence.

<u>Roslyn Swim Club</u>, 213 A.2d at 149.

To establish the order of precedence between inconsistent calls in a deed, the Superior Court instructed:

> Where the calls for the location of boundaries to land are inconsistent, *other things being equal*, resort is to be had first to natural objects or landmarks, next to

---

[43] "Monuments are visible markers or indications left on natural or other objects indicating the line of a survey." <u>Long Run Timber Company v. DCNR</u>, 145 A.3d 1217, fn. 6 (Pa.Cmwlth. 2016), quoting <u>Grier v. Pa. Coal Co</u>. 14 A. 480, 482 (Pa. 1889).

[44] 11 C.J.S. Boundaries §51 instructs, "The rule that artificial monuments control courses and distances in case of conflict is not an imperative and exclusive one, but is a rule of construction to ascertain, or to aid in determining, the intention of the parties; and it is not followed where strict adherence to the call for a monument would lead to a construction plainly inconsistent with such intention."

artificial monuments, then to adjacent boundaries (which are considered a sort of monument), and thereafter to courses and distances.
[...]

Where, however, it is apparent that a mistake exists with respect to the calls, an inferior means of location may control a higher one. In the last analysis, the call adopted as the controlling one should be that most consistent with the apparent intent or the grantor.

Generally, among the inferior calls, course will control distance if they are inconsistent, and course and distance will control quantity.

Roslyn Swim Club, 213 A.2d at 148-9, quoting 12 Am.Jur.2d Boundaries, §65, 603 (emphasis in original).

Further, with respect to quantity of land:

Evidence of the acreage of land, especially where the number of acres is followed by the words 'more or less', has little weight as against specific boundaries and is in its nature an uncertain method of description and often a mere estimate. Where, however, a doubt exists as to the actual location of the boundary and the writing contains no words to definitely fix the line by either metes and bounds or monuments on the ground, evidence of the acreage becomes a material factor in the determination of the intention of the parties...

Pencil, 551 A.2d at 307, quoting Dawson v. Coulter, 106 A.187, 188 (Pa. 1919).

With these principles in mind, we turn our attention to the dispute at issue.


I.    **AREA C**

Recall that our February 26, 2014 Opinion and Order held that the boundary between the parties' respective tracts in Area C is the Plessinger Division Line. The issue for resolution is where on the ground the Plessinger Division Line lies.

**A. MFLP:**

As to Area C, MFLP relies on the testimony of Watson, a licensed surveyor with over 25 years of experience, to establish the location of the Plessinger Division Line. Watson's credible testimony, as detailed above, described in methodical detail the step-by-step process he

27

undertook to recreate the Plessinger Division line. MFLP therefore argues that the division line in Area C is where Watson found it to be as evidenced by his survey. See Pl. Ex. 1.

MFLP, as the moving party in this quiet title action, has met its burden of demonstrating good title through Watson's testimony. "Testimony of experienced surveyors, especially those familiar with original monuments, is extremely valuable in establishing the location of boundary lines." Com., Pennsylvania Game Comm'n v. Keown, 471 A.2d 937, 940 (Pa.Cmwlth. 1984) (internal citations omitted). As such, MFLP is deemed to have title unless or until better title is demonstrated by the Mellotts. See Poffenberger, supra.

### B. The Mellotts:

Contrary to their prior arguments and this Court's prior findings *in their favor*, the Mellotts now argue that the Plessinger Division Line is not the boundary between MFLP Tract A and Mellotts' Tract 1 in Area C. Compare Motion for Summary Judgment Opinion and Order, February 26, 2014 with Defendants' Proposed Findings of Fact and Conclusions of Law ("Def. FF/CL"). What the Mellotts ultimately request is that this Court award MFLP "acreage in the northeast corner of the tract and define the tract by acreage at the Court's discretion." Def. FF/CL, CL¶26. In the alternative, the Mellotts suggest that the parties be permitted the chance to agree to the location. Id.[45]

At its simplest, the Mellotts' position is that George and Sally Harris could not divide that which they not own; therefore, the Plessinger Division Line must be disregarded if it cannot be demonstrated that the Plessinger Division Line was physically located within the area of Noah

---

[45] As this matter has been pending since the filing of the initial complaint in November, 2012, and since we issued rulings on several motions seeking summary judgment that could have been the basis for compromise, we are constrained to find that what these parties now need is a definitive ruling from this Court that can either be accepted as the final resolution of this matter or the basis for appellate review. Sending the parties "back to the drawing board" to reach an agreement is not an acceptable resolution and would likely only prolong this litigation further.

28

Mellott's title. To further their position, the Mellotts note the historical record supports the conclusion that Divelbiss possessed only 125 acres, more or less, to convey to Noah and Vallance in 1865 and "MFLP failed to present any evidence that would allow the Court to establish a description based on monuments or metes-and-bounds description for the title conveyed by [Divelbiss] to [Noah] and [Vallance]." Def. FF/CL, CL¶18. The Mellotts argue, as a matter of law, this Court must rely on acreage. Id. Therefore, Noah and Vallance could not have divided their 125-acre parcel into a 110-acre, 40-perch parcel (to Noah) and a 49-acre, 139-perch parcel (to Vallance). The Mellotts argue that it follows that Noah did not own—and therefore could not convey—110 acres, 40 perches to remote grantees Lizzie McClure and ultimately George and Sally Harris.

We may agree with the Mellotts that the historical record and simple mathematics lends some support for such a position – but only if we accept as fact that Divelbiss only owned and conveyed to Noah and Vallance 125 acres, more or less. Recall, "Evidence of the acreage of land, especially where the number is followed by the words 'more or less', has little weight as against specific boundaries and is in its nature an uncertain method of description and often a mere estimate." Pencil, 551 A.2d at 307.

The historical record appears void of any metes-and-bounds description of the property Divelbiss conveyed to Noah and Vallance. Neither Henry nor Watson uncovered such a description. However, the 1870 agreement dividing the property between Vallance and Noah incorporates a drawing with a metes-and-bounds description and adjoiners. See Def. Ex. 8. "Where maps are referred to in a conveyance, they are regarded as incorporated into the instrument and given considerable weight in determining the true description of the land." Com.,

29

Pennsylvania Game Comm'n v. Keown, 471 A.2d 937, 939–40 (Pa. Cmwlth.1984) citing Dallas Borough Annexation Case, 82 A.2d 676 (Pa.Super.1951).

Neither party analyzed the descriptions as set forth in the drawing incorporated into the Noah/Vallance Agreement other than to note the total quantity of land Noah and Vallance each intended to receive as a result of the division. In fact, the Mellotts argue that the survey incorporated into the agreement "is not effective to enlarge their joint title beyond what was conveyed in the Divelbiss deed." Def. FF/Cl, CL¶16. We agree that title may not be enlarged by the survey; however, the inquiry cannot end there.

The drawing has another important use – describing the parcel conveyed.

> The *title* to lands cannot be acquired or established by unofficial diagrams, drafts, or surveys. But such papers may often be extremely useful in fixing and designating doubtful boundaries. It has been an ancient custom of the courts to receive them in evidence for what they are worth, in illustrating a question of boundary.

Sweigart v. Richards, 8 Pa. 436, 438–39 (1848)(emphasis in original). Therefore, we will use the drawing, "for what it is worth." Specifically, the drawing does not expand or increase the title of Noah (or Vallance); rather, the drawing is evidence that the parcel actually owned by Noah and Vallance and subsequently divided, when surveyed, included more than 125 acres. Noah's title is not increased by the drawing; rather, Noah's title is more accurately defined and described by the drawing.

Defendant's urge us to find that Noah and Vallance owned only 125 acres, period. They further argue that the legal principle of "priority" compels the conclusion that the First Harris Deed's explicit conveyance of 82 acres, 71 perches to Howard Mellott the elder further demands the conclusion that only the remainder, i.e., 3 acres, more or less, was available to be conveyed

30

to Grover Mellott in the Second Harris Deed.[46] Defendants suggest, "The boundary for Noah Mellott must be constructed by considering his total acreage after apportioning the boundary[ ] between Noah Mellott and William Vallance based on their joint title of 125 [acres,] more or less." Def. FF/CL,CL¶ 21, (footnote omitted). Because neither Noah nor Vallance had superior title, Defendant's argue apportionment is required. To that end, Defendants propose the following calculation:

> Based on the acreage that Noah Mellott and William Vallance purported to divide, Noah Mellott acquired 68.86 percent of the title contained in the Divelbiss Deed (110.25 acres divided by 160.11875 acres total) and William Vallance acquired 31.14 percent of the title (49.86875 acres divided by 160.11875 acres total). Applying these percentages to the title conveyed by the Divelbiss Deed, Noah Mellott only acquired 86.075 acres or 86 acres and 12 perches.

Def. FF/CL, CL¶ 24.[47]

Practically speaking, what the Mellotts propose could upend nearly 150 years of property ownership by MFLP and their predecessors in title.[48] Indeed, Noah and Vallance entered into an agreement in 1870 to divide the land they obtained from Divelbiss in 1865. The agreement included a drawing or survey with a specific metes-and-bounds description of each parcel as well as noted the adjoiners. After a series of conveyances, Noah's parcel was obtained by George and Sally Harris. The First and Second Harris Deeds, with specific, although erroneous metes-and-bounds descriptions, were executed in 1917 and recorded in 1944 and 1932, respectively.

The act of recording provided all concerned - including future purchasers - the opportunity to learn of error and inconsistency. Inexplicably, the first discovery of the errors in

---

[46] Recall that our February 26, 2014, Opinion and Order found that the First Harris Deed was superior to the Second Harris Deed.

[47] As we understand the calculation:
125 acres x .6886 = 86.075 acres to Noah
125 acres x .3114 = 38.925 acres to Vallance.

[48] We are also not convinced that such a determination would not have the unintended consequence of negatively affecting the property rights of adjoining landowners not parties to this litigation.

31

the metes-and-bounds descriptions in the First and Second Harris Deeds was in the instant

timbering dispute in 2010, some 140 years after Noah and Vallance entered their agreement and

90 years after the Harris Deeds were executed. Now, in 2019, this Court is asked to turn back

time and correct the errors.

To correct the errors in the Harris Deeds we must decide what, precisely, the errors are;

scrivener errors or something far more extensive.

The Mellotts' proposed resolution would also effectively vacate our prior ruling. We find

that the "law of the case" doctrine can, and in this instance does, preclude such a result.

> The law of the case doctrine refers to a family of rules which embody the concept
> that a court involved in the later phases of a litigated matter should not reopen
> questions decided by another judge of that same court or by a higher court in the
> earlier phases of the matter. ... The various rules which make up the law of the
> case doctrine serve not only to promote the goal of judicial economy ... but also
> operate (1) to protect the settled expectations of the parties; (2) to insure
> uniformity of decisions; (3) to maintain consistency during the course of a single
> case; (4) to effectuate the proper and streamlined administration of justice; and (5)
> to bring litigation to an end. Absent extraordinary circumstances, the doctrine bars
> a judge from revisiting a ruling previously decided by another judge of the same
> court. In determining whether the law of the case doctrine applies, the appellate
> court looks to where the rulings occurred in the context of the procedural posture
> of the case. Our Supreme Court has cautioned that [i]n some circumstances,
> however, application of the rule can thwart the very purpose the rule was intended
> to serve, i.e., that judicial economy and efficiency be maintained. Thus we [have
> said] that departure from the rule of coordinate jurisdiction is allowed where the
> prior holding was clearly erroneous and would create a manifest injustice if
> followed. Moreover, the rule does not apply where two motions differ in kind,
> then a second judge is not precluded from granting relief though another judge
> has denied an earlier motion. The rule does not apply when distinct procedural
> postures present different considerations, then a substituted judge may correct
> mistakes made by another judge at an earlier stage of the trial process, or, perhaps
> more accurately, may revisit provisional rulings made earlier in the litigation.

Windows v. Erie Ins. Exch., 161 A.3d 953, 959 (Pa.Super. 2017) (internal citations and

quotations marks omitted).

32

Based on the evidence presented we are constrained to find that the errors in the First and Second Harris Deeds are scrivener errors. We find compelling the metes-and-bounds description on the 1870 agreement, allowing us to find that the parcel Noah and Vallance owned and subsequently divided initially included more than 125 acres.

Accordingly, despite Henry's careful research and the credible evidence on which he instructed the Court from the historical record, we cannot find that better title has been demonstrated by the Mellotts than that which has been demonstrated by MFLP. We will not vacate our prior finding; specifically: "the division line between the two parcels is the Plessinger Division Line and it is from the First Harris Deed that the division line must be constructed." February 26, 2014 Opinion and Order of Court, at 19.

We find Watson's testimony as to his efforts to reconstruct the Plessinger Division Line to be credible and convincing. Watson applied the boundary retracement principles as described above and has "walked in the steps of the original surveyor." Conversely, Henry is not a surveyor. The Mellotts do not proffer the Shelly Survey as accurate and have offered no survey to demonstrate their position "on the ground" to counter that offered by MFLP.

We understand that our function as the trial court, "is to ascertain the intent of the grantor at the time of the original subdivision." Pencil v. Buchart, 551 A.2d at 305–06. We are constrained to find that Watson has captured, to the best of his professional ability, based on the facts and circumstances presented by the field evidence and the record evidence, the intent of grantors, George and Sally Harris, who we deem to be the applicable grantors in the instant inquiry. Accordingly, the division line between MFLP and the Mellotts in Area C shall be as surveyed by Watson and set forth in the Watson Survey. See Pl. Ex. 1.

33

## II.    AREAS A & B

As to Areas A and B, the parties agree in theory that the "legal" boundary is/was established by the Lake Second Survey. The parties differ on where that boundary lies on the ground and what effect, if any, the passage of time and the acts of subsequent landowners many have on the location of the boundary today.

### A. MFLP:

In Areas A and B, MFLP urges the Court to consider, again, their theory of consentable line, as

> there were disputed, contradictory documents of record, adverse to the interest of [the Mellotts] and/or their predecessors-in-interest, and in each instance, either [the Mellotts] and/or their predecessors-in-interest commissioned the preparation and recordation of the surveys which reconciled and compromised their respective boundaries (see, for e.g., the Fisher Survey, the Best Survey, and the Best/Angle Survey) and then recognized those boundaries (see, Clem Malot's testimony about the Mill Road Hunting Club lease boundaries) and Watson used those surveys, together with fence remnants, identified in the Fisher Survey (and on the ground by Watson) to determine the eastern boundary of MFLP Tracts (O) and (K) where those Tracts adjoin the western boundary of Howard J. Mellott, John J. Mellott, and the Mellott Family Trust's real estate in regards to Areas A and B.

Plaintiff's Proposed Findings of Fact and Conclusions of Law ("Pl. FF/CL"), ¶ O. We previously considered and rejected this theory in our Opinion and Order entered February 26, 2014, which resolved the parties' cross-motions for partial summary judgment. MFLP is now arguing a theory of consentable line as to Areas A and B, rather than Area C. This argument merits another look.[49]

---

[49] In Plauchak v. Boling, the Superior Court recognized the benefits of resolving boundary disputes through consentable line:

> As our Supreme Court recognized in 1835, [t]here is no survey of ordinary size, the lines of which will measure exactly to the corners, or to the places where they once stood; hence, every surveyor in tracing old surveys expects to find and does find the length of every line differing more or less from his draft. Therefore, our courts have always favored boundaries established by consentable line, especially where, as here, the courses and distances on the ground do not correspond to the metes and bounds contained in the paper record.

The establishment of a boundary line by acquiescence for the statutory period of twenty-one years has long been recognized in Pennsylvania.[ ] Two elements are prerequisites: 1) each party must have claimed and occupied the land on his side of the line as his own; and 2) such occupation must have continued for the statutory period of twenty-one years. [...] the doctrine functions as a rule of repose to quiet title and discourage vexatious litigation.

[...] An examination of the decisional law demonstrates, however, that the doctrinal roots of acquiescence are grounded in adverse possession theory;[ ] indeed, occupancy with open manifestations of ownership throughout the statutory period will generally satisfy the traditional elements of adverse possession.[ ] Decisions involving acquiescence are frequently distinguishable from adverse possession cases only in that possession in the former are often based on a mistake as to the location of property lines.

Zeglin v. Gahagen, 812 A.2d 558, 561–63 (Pa. 2002)(internal citations and quotations omitted, footnotes omitted).

As described above, the doctrine of consentable lines may be established in two different ways: dispute and compromise or recognition and acquiescence. Sorg v. Cunningham, 687 A.2d 846, 849 (Pa.Super.1997), citing Niles v. Fall Creek Hunting Club, Inc., 545 A.2d 926 (Pa.Super.1988)(en banc). In a dispute and compromise scenario, a party may establish that a boundary has been agreed to after a dispute and compromise. Id. Clearly, establishing a consentable line through dispute and compromise is not applicable to the instant matter. There is no evidence of any compromise by the parties. There is also no evidence of any dispute prior to the 2010 timber trespass allegation.

Proof of consentable line can also be established by recognition and acquiescence. Under such a theory the court must find: (1) that each party has claimed the land on his side of the line as his own; and (2) that this occupation has occurred for the statutory period of twenty-

---

653 A.2d 671, 677 (Pa.Super.1995)(citations and quotations omitted). "As a result of this inconvenient reality, our courts favor establishing boundaries by consentable lines." Id.

one years. Plauchak v. Boling, 653 A.2d 671, 675 (Pa.Super.1995). "Pennsylvania law is clear that successive owners in privity to one another may tack the possessory rights of a prior owner which were acquired through the establishment of a consentable line." Id. at 677.

> The general rule is that one who claims title to property through another, regardless of the nature of the transfer whether by the act of the parties or the act of law, is bound by earlier acts or declarations of his predecessor and takes the title *cum onere*. Under this rule all acts and declarations of the owner of land made during the continuation of his interest tending to show the character or extent of his possession or interest, or the location of boundaries, are competent evidence not only against himself but also against those who claim through or under him.

Plauchak, 653 A.2d at 676–77, (citations omitted).

Specific consent to the location of the line is not required. Id. at 676. "It must nevertheless appear that for the requisite twenty-one years a line was recognized and acquiesced in as a boundary by adjoining landowners." Id. (citations and quotations omitted).

For example, "[…] a boundary line may be proved by a long-standing fence without proof of a dispute and its settlement by a compromise." Sorg v. Cunningham, 687 A.2d 846, 849 (Pa.Super.1997).

> It cannot be disputed that occupation up to a fence on each side by a party or two parties for more than twenty-one years, each party claiming the land on his side as his own, gives to each an incontestable right up to the fence, and equally whether the fence is precisely on the right line or not. In such a situation the parties need not have specifically consented to the location of the line.

Sorg, 687 A.2d at 849, quoting Dimura v. Williams, 286 A.2d 370, 371 (Pa. 1972). Further, "[a] consentable boundary line need not be a fence necessarily, and a boundary established by survey is sufficient." Sorg, 687 A.2d at 849 (citing Niles v. Fall Creek Hunting Club, Inc., 545 A.2d 926 (Pa.Super.1988) (*en banc*)). See also, Miles v. Pa. Coal Co., 91 A.2d 211 (Pa. 1914) ("It has long been settled in Pennsylvania that a person in possession by a fence as his line for more than 21 years, establishes his right to claim title to the line thus marked.")

36

Turning to the instant matter, MFLP initiated this litigation on November 14, 2012, with the filing of the Complaint. The Amended Complaint, filed January 18, 2013, alleges, "In early 2010 MFLP was harvesting timber within Tract (o), Track (k), Tract (a), and Tract (m)." Amend. Comp. ¶14. "In early 2010 Defendant Trustee Ralph D. Mellott observed that MFLP was harvesting timber and objected, claiming that some of the timber being harvested by MFLP was located on his property based on survey markers placed on the ground in the context of preparation of the [June 8, 1989 Shelly & Witter] Survey." Amend. Comp. ¶15.

Given the above factual scenario, it is presumed, for the purposes of beginning the discussion, that the 21-year time-line ends not later than March, 2010. The Timber Trespass Report authored by Thomas O'Neal, is dated March 26, 2010. See Pl. Ex. 3. Inexplicably, however; MFLP's Proposed Findings of Fact and Conclusions of Law is silent as to whether the 21-year recognition period has been established and, if so, how.

MFLP argues, "either [the Mellotts] and/or their predecessors-in-interest commissioned the preparation and recordation of the surveys which reconciled and compromised their respective boundaries (see, for e.g., the Fisher Survey, the Best Survey, and the Best/Angle Survey) and then recognized those boundaries..." Pl. FF/CL", ¶ O.

The Fisher Survey was completed in October, 1989, on behalf of James and Clyde Mellott. See Pl. Ex. 4. It was from the Fisher Survey that Watson confirmed the location of iron rods and a railroad spike at the corners of John's and the Mellott Family Trust property to the north.

The Best Survey was prepared for John Mellott in July, 1989. See Pl. Ex. 5. Watson also used the Best Survey to verify the corners of John's property. The Best Survey indicates that a fence lies along the western boundary of John's property with MFLP. Further, John's deed

37

incorporates the Best Survey which calls for MFLP's predecessor in title as an adjoiner on the western border.

The Angle Survey was prepared for Gibson and recorded on April 30, 2001. See Pl. Ex. 12. The Angle Survey, like the Lake Second Survey, called for the iron rod in stones that both parties agree marks the northwestern corner of Howard Mellott the younger and the northeastern corner of Gibson.

MFLP proffers the Mill Road Hunting Club lease boundaries as additional evidence of the Mellotts' recognition and acquiescence of the boundary as described by Watson. According to Clem, the Club acknowledged the border in the area defined by the Watson Survey; however, the lease was in effect from 2000 through 2008 – at least two years before the Watson Survey was completed. There was no additional evidence to suggest that Clem, his wife, Jana, or MFLP's other partners or predecessors in interest treated the fence at issue (Best Survey) or the iron rods and railroad spikes (Fisher Survey) as the boundary between the parties' respective tracts.

Given this record, we cannot find that the Mellotts recognized and acquiesced in the fence (or the location of the railroad spikes) for the requisite 21 years. Twenty-one years prior to March, 2010 would be March, 1989. The Best Survey was not prepared until July, 1989, John's deed was not recorded until September, 1989, and the Fisher Survey was not completed until October of the same year; months short of the requisite 21-year period. Accordingly, MFLP's claim of consentable line must fail, albeit by only a few months.

## B. THE MELLOTTS:

The Mellott's ultimate conclusion of law with respect to Areas A and B is this:

38

> The eastern boundary for MFLP Tract (o) and Tract (k), established by the Thompson and Cummins Surveys, that adjoins the Parker Survey, must be used to determine MFLP's eastern boundary and Mellott's western boundary, and the subsequent survey of lands within the Parker Survey cannot change or move that boundary as a matter of law.

Def. FF/CL, CL¶12. Again, the Mellotts urge us to refer back to the Thompson Survey of 1784, the Cummins Survey of 1787,[50] and the Parker Survey of 1796 to resolve this 2010 boundary dispute. The Mellotts agree that the Lake Second Survey shows the Thompson/Cummins Warrant boundary; however, argue that the field evidence as determined by Watson does not match the Lake Second Survey. Simply stated: the Mellotts dispute that the fence along the western boundary of John's property is the boundary between the parties as called for in the Lake Second Survey.

The Mellotts agree that the northeastern corner of the Gibson property/northwestern corner of Howard Mellott the younger's property as depicted on the Watson Survey as IRF IN STONES is on the boundary between MFLP Tract (o) and Howard J. Mellott the younger's Tract 2. Def. FF/CL, FF¶23. However, they argue that Watson's reliance on the fence was clearly erroneous and further argue, "Watson's reliance on the surveys of Angle, Best and Fisher to change the Lake Second Survey and the Thompson and Cummins Surveys, is erroneous as a matter of law." Def. FF/CL, CL¶¶6-7.

What this case comes down to is the difference between the approach of a learned mathematician who has: undertaken a careful study of the ancient deeds and other documents, applied mathematical principles, and used technology to reach his conclusion and an experienced, licensed surveyor who has: undertaken a careful study of the relevant documents (both ancient and modern), collected and analyzed field evidence, applied modern surveying principles and techniques, and completed a comprehensive survey of all tracts and some

---

[50] The Cummins Survey contains a scrivener error which results in a misclosure. Def. FF/CL, FF¶3.

adjoiners at issue in reaching his conclusions. In this case, we must find the opinion of Watson to carry the day.

Although we have found MFLP's theory of recognition and acquiescence inapplicable, it does not follow that we also find Watson's conclusion regarding the location of the boundary between the parties' respective tracts to be in error – either legally or factually. To the contrary, as we noted above, we find Watson's testimony to be credible and compelling.

Watson explained in exacting detail the process by which he arrived at his ultimate conclusions. Watson used the fence which borders John's property (and MFLP's eastern boundary) - the same fence used by Barry Best in completing his survey in July, 1989 - as field evidence relevant to his conclusion. We cannot find that he erred in doing so.

At trial, this exchange took place between Attorney Benchoff and Watson:

Q: Glenn, as you are there and I asked you previously about what you found as you proceeded north from below and got up to John Mellott's property and you mentioned that you found some old remnants of fencing. Can you show the Court and maybe draw in blue where you found some old fence remnants? [See Pl. Ex. 1]

A: We found remnants along this portion of the line starting about right there and going in a southwest –southwest direction the full length of the John Mellott property.

Q: So there were fence remnants all along what you believed to be – what we believe to be the border between MFLP and John Mellott?

A: That's right. And according to our record research the Barry Best Survey also showed fence remnants on that same boundary.

Q: And that's actually on the Best Survey. You can see hatching delineated on the Best Survey, the old fence remnants? [See Pl. Ex. 5]

A: So that gave us a good sense of confidence that we were at the same location as what Barry Best was.

T.P. 3/21/19 at 64-65. Watson noted that the Best Survey indicates that a fence lies along the western boundary of John's property. The Best Survey is referenced and incorporated in the September 22, 1989 deed from James B. Mellott and Clyde E. Mellott to John J. Mellott and his wife, Marjorie A. Mellott. See Pl. Ex. 39. The deed and the incorporated Best Survey describe the parcel as adjoining the land of J. Woodrow Malot (on the western boundary).

Accordingly, while the fence may not be evidence sufficient to establish a boundary under the legal theory of consentable line by recognition and acquiescence, it is evidence on which Watson may credibly rely in compiling field evidence and completing his survey. Further, it is evidence on which this Court may rely in establishing the boundary in Area B. Recall,

> [...] all acts and declarations of the owner of land made during the continuation of his interest tending to show the character or extent of his possession or interest, or the location of boundaries, are competent evidence not only against himself but also against those who claim through or under him.

Jedlicka v. Clemmer, 450 Pa.Super.647, 653, 677 A.2d 1232, 1234–35 (1996), citing Plauchak, 653 A.2d 671,676 (Pa.Super. 1995) and Dawson v. Coulter, 106 A.187, 188 (Pa. 1919).

As we have found the fence to be credible evidence on which Watson could rely in completing the survey of the various tracts at issue, it therefore follows that the balance of Watson's work in this area can be accepted by this Court as evidence of the boundary between the parties in Areas A and B.


## III.  UNJUST ENRICHMENT

In Count II of the Amended Complaint, MFLP alleges that Defendants Ralph and Doretta Mellott, Trustees of the Mellott Family Trust, were unjustly enriched when they retained $2089.24 from Clem Malot as payment for timber cut from the disputed areas. Amend. Comp. ¶49.

"An action based on unjust enrichment is an action which sounds in quasi-contract or contract implied in law. A quasi-contract imposes a duty, not as a result of any agreement, whether express or implied, but in spite of the absence of an agreement, when one party receives unjust enrichment at the expense of another." Discover Bank v. Stucka, 33 A.3d 82, 88–89 (Pa.Super.2011) (quotation and citations omitted). To succeed on a claim of unjust enrichment, the plaintiff must prove:

> [...] benefits conferred on defendant by plaintiff, appreciation of such benefits by defendant, and acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value. Whether the doctrine applies depends on the unique factual circumstances of each case. In determining if the doctrine applies, we focus not on the intention of the parties, but rather on whether the defendant has been unjustly enriched.
>
> Moreover, the most significant element of the doctrine is whether the enrichment of the defendant is *unjust*.

Joyce v. Erie Ins. Exch., 74 A.3d 157, 169 (Pa.Super. 2013)(emphasis in original). Further, "To sustain a claim of unjust enrichment, a claimant must show that the party against whom recovery is sought either wrongfully secured or passively received a benefit that it would be unconscionable for her to retain." Gutteridge v. J3 Energy Grp., Inc., 165 A.3d 908, 917 (Pa.Super.2017) (internal quotation marks and citations omitted). "The doctrine does not apply simply because the defendant may have benefited as a result of the actions of the plaintiff." Id.

At trial, Clem testified that Tom O'Neal assessed the timber that had been cut in the area of dispute and paid Ralph two times the value. T.P. 3/21/19 at 39-40. Clem explained, "It was not an indication of negligence. It was between us friends, family and neighbors until we get this straightened out it seemed the right thing to do." Id. at 39. Clem acknowledged that O'Neal who actually wrote the check to Ralph; however, the amount paid to Ralph reduced MFLP's profit from the timbering operation. To Clem, the payment was tendered conditioned on the

42

findings of the survey. MFLP argues that Clem "caused" the sum to be paid to Ralph in good faith. See Pl. FF/CL, ¶EE.

The Mellotts presented no evidence on this claim. They argue that because the $2089.24 came from O'Neal, rather than from Clem, the unjust enrichment claim must fail.

Neither side presented the testimony of Thomas O'Neal. O'Neal's correspondence to Ralph appears in the record as Exhibit 3 to Plaintiff's Amended Complaint. Said correspondence can be summarized as acknowledging O'Neal Forestry's mistake in marking and cutting timber on Ralph's land, offering Ralph an apology, and including payment consistent with the value of the timber determined in the Timber Trespass Report which, presumably, accompanied the letter and the check. See Amended Complaint, Ex. 3.

To prove unjust enrichment, MFLP must show benefit conferred on Ralph and Doretta, Trustees of the Mellott Family Trust, by MFLP; appreciation of the benefits by Ralph and Doretta; and acceptance and retention of the benefit "under such circumstances that it would be inequitable for Ralph and Doretta to retain the benefit without payment of value. Lackner v. Glosser, 892 A.2d 21, 34 (Pa.Super.2006). The applicability of the unjust enrichment doctrine depends on the unique circumstances of the case. MetroClub Condo. Ass'n v. 201-59 N. Eighth St. Assocs., L.P., 47 A.3d 137, 148 (Pa.Super.2012).

To be sure, Ralph and Doretta received a payment of $2089.24 in March, 2010, from O'Neal Forestry for twice the value of the timber O'Neal believed he erroneously harvested on Ralph's land. The evidence presented at trial leads this Court to conclude that at the time Ralph received the payment, Ralph believed he was being paid for timber harvested from his land. There is no evidence that the payment came from Clem. The correspondence from O'Neal to Ralph includes no conditional language which requires repayment to O'Neal (or Clem) in the

43

event some future survey (or court) finds the timber belonged to Clem. There is no evidence of any agreement for repayment depending on the outcome of the survey.

Rather, the evidence of record leads us to conclude O'Neal freely paid Ralph to resolve a potential dispute. It is of no consequence that we have ultimately found the disputed area to be the property of MFLP. O'Neal chose to settle his potential liability with Ralph rather than proceed with litigation. This is not unjust enrichment.

Therefore, based on the record evidence, O'Neal paid Ralph $2089.24 because in 2010 O'Neal believed that he had trespassed on Ralph's land and cut his timber. We now know that the timber actually belonged to Clem. We also know that Clem believed the payment to Ralph was conditional on the result of the survey. On what Clem based his belief, we do not know.

Because the benefit to Ralph was conveyed by O'Neal at a time when it appeared that Ralph was legally entitled to receive it, and because the payment was not conditioned on Ralph repaying the money if/when a survey confirmed the timber was actually harvested from Clem's land, we cannot find that MFLP has sustained a claim for unjust enrichment.

In addition, while Ralph received a benefit of $2089.24 from O'Neal, the record is clear that sum represented twice the value of the timber. Clem claims the entire amount; however, had O'Neal paid Clem the value of the timber harvested from the disputed area, Clem would have received only $1044.62, half of the amount paid by O'Neal to Ralph. O'Neal is not a party to this litigation and has made no claim to this Court for $1044.62. An award of $2089.24 to Clem would also smack of unjust enrichment, would it not?

44

## IV.    TIMBER TREPASS

Based on our findings above, we need not discuss the Mellott's claim for timber trespass further.

## CONCLUSION

In sum, we have found Watson's testimony credible. We have found Watson's work to be legally and factually compelling. MFLP has demonstrated *prima facie* evidence of title in this quiet title action with respect to the areas of dispute, Areas A, B, and C. Mellotts have not demonstrated better title. In fact, MFLP has demonstrated good title by the requisite fair preponderance of the evidence. Accordingly, on Count I – Quiet Title, we find for MFLP.

On Count II – Unjust Enrichment, we find for the Mellotts, as MFLP has not demonstrated, under the unique circumstances of this case, that the $2089.24 payment from O'Neal Forestry to Ralph was unjust.

On the Mellott's Counterclaim for Timber Trespass, we find for MFLP, as we have found MFLP to hold title to the areas of dispute.

An Order follows.

45

# IN THE COURT OF COMMON PLEAS OF THE 39TH JUDICIAL DISTRICT OF PENNSYLVANIA -- FULTON COUNTY BRANCH

| | | |
|---|---|---|
| Malot Family Limited Partnership,<br>Plaintiff | : | Civil Action - Law |
| | : | |
| v. | : | No. 2012-445 |
| | : | |
| Howard J. Mellott and Karla J. Mellott,<br>Ralph D. Mellott and Doretta K. Mellott,<br>Trustees of the Mellott Family Trust and<br>John J. Mellott and Marjorie A. Mellott,<br>Defendants | : | Honorable Angela R. Krom, J. |

## ORDER OF COURT

AND NOW, this __15th__ day of __November__, 2019, after trial in this matter and upon consideration of the proposed Findings of Fact and Conclusions of Law submitted by the parties, the record, and the applicable law;

**IT IS HEREBY ORDERED:**

1. On Count I – Quiet Title, we find for MFLP and direct that the boundary in disputed Areas A, B, and C shall be as depicted on the 2010 Watson Survey

2. On Count II – Unjust Enrichment, we find for the Mellotts.

3. On the Counterclaim for Timber Trespass, we find for MFLP.

*Pursuant to Pa.R.C.P. Rule 236, the Prothonotary shall give written notice of the entry of this Order, including a copy of this Order, to each party, and shall note in the docket the giving of such notice and the time and manner thereof.*

By the Court,

Angela R. Krom, J.

Distribution:
Andrew J. Benchoff, Esq., Counsel for Plaintiff
J. McDowell Sharpe, Esq., Counsel for Defendants
Alexander C. Sharpe, Esq., Counsel for Defendants

